Marc L. Godino (#182689)
Mark S. Greenstone (#199606)
Kara M. Wolke (#241521)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORA HASKETT, ASHLEY HEALY, JOCELYN BURKE-CRAIG, BRITTANY BIANCHI, KERRY TIGHE-SCHWEGLER, Individually, and On Behalf of a Class of Similarly Situated Individuals,<br><br>    Plaintiffs,<br><br>  v.<br><br><br> LULAROE, LLC d/b/a LULAROE, LLR, INC.,<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Lora Haskett, Ashley Healy, Jocelyn Burke-Craig, Brittany Bianchi, and Kerry Tighe-Schwegler, on behalf of themselves and those similarly situated, sue defendants LuLaRoe, LLC d/b/a LuLaRoe and LLR, Inc. (collectively "LLR" or "Defendants"), and allege as follows:

## I.   PRELIMINARY STATEMENT

1.      LLR generated nearly $1 billion in revenues in 2016 by operating a pyramid scheme.

2.      In a pyramid scheme, participants pay money into the scheme for the right to receive compensation from the scheme based, in large part, on bringing new participants into the scheme. Each participant's money is used to pay others in the scheme, as well as the scheme promoter. The more recruits a participant has under her, and the closer to the top of the pyramid she is, the more money she might make. Participants will lose their money unless they recruit enough new participants, who will also lose their money unless they recruit enough new participants, and so on. Because there is little or no money flowing into the scheme from non-participants, and since payments are shared with the "upline"[1] and disproportionately with the persons closer to the top of the pyramid, the vast majority of participants are doomed to lose most or all of their money.

3.      "Fashion Consultants" are at the base of LLR's pyramid scheme. LuLaRoe specifically targets stay at home mothers for the role of Fashion

---

[1] Most people are recruited into a pyramid scheme by a sponsor who is already involved in the pyramid scheme.  That sponsor – along with other consultants in levels above the person being recruited – is considered that person's "upline." People in the upline will receive a percentage of a new recruit's sales. This will entice the new recruit, as well people in the upline, to recruit more consultants.

Consultants with the message that they can earn an income working from home selling LLR women's clothing.  LLR recruitment materials tout the business as "part time work, full time pay."

4.     Fashion Consultants must initially pay LLR between $5,000-$8,000: (a) to purchase LLR's women's apparel (the Fashion Consultant's initial inventory), and (b) for the right to earn bonuses by starting a "team" or "downline" – *i.e.*, recruiting others to become Fashion Consultants and earn commissions based on the value of the clothing that they and their downline purchase from LLR.

5.     Defendants' business model is centered on convincing Fashion Consultants to purchase inventory from LLR and recruiting others to do the same. Defendants made millions of dollars based on Fashion Consultants' purchases.  At the same time, Fashion Consultant's ability to sell Defendants' products for a profit to non-Fashion consultant end-users is very difficult for a variety of reasons (discussed in more detail below). One of the main reasons is that Fashion Consultants have no control over the patterns they receive from LLR, and many of the clothes' bolder and/or brighter patterns are unsellable.  Defendants take advantage of this by informing consultants that these items will eventually sell and that they should continue to purchase more inventory, and claiming that the most successful consultants have between 600-800 pieces in their inventory. Defendants' marketing creates a snowball effect where Fashion Consultants feel compelled to buy more inventory hoping a few of the items they receive will sell, while stockpiling most of the unusable items.

6.      Defendants sell Fashion Consultants on the idea that they  can  earn and increase  bonus payments from LLR and obtain financial independence, by recruiting other Fashion Consultants (their "downline").

7.     To be eligible for these bonuses from LLR in any given month, a Fashion Consultant must be considered "active."   Active status within LLR

requires both the Fashion Consultant and their downlines to make a required level of purchases from LLR (approximately $5,000.00) in that month.  Thus, uplines place significant pressure on downlines to make their minimum monthly purchases, even if the downlines do not need the inventory.

8.     LLR's bonus payments to each Fashion Consultant is based on the wholesale value of the Fashion Consultant's purchases, the number of downlines the Fashion Consultant recruits into the program, and the dollar value of her downlines' monthly purchase from LLR – not on the amounts that the Fashion Consultant or her downlines sell to end users.[2]

9.     LLR's system thus incentivizes Fashion Consultants to engage in inventory loading ; *i.e.*, purchasing product they do not need for retail sales or their own personal use.  Indeed, LLR specifically designed its system to incentivize Fashion Consultants to purchase product they do not need.  LLR even suggests to Fashion Consultants that they take out low interest credit cards to finance more inventory, hire a nanny, and put their children to work in order to sell LLR merchandise.

10.    In weekly live video calls, LLR owners Mark and Deanne Stidham consistently urge Fashion Consultants to purchase additional inventory, reinvest any profits into buying more inventory and recruiting new Fashion Consultants.

---

[2] This was LLR's policy until approximately July, 2017, when LLR purported to require sales, but as alleged more fully below, the bonuses are still based on wholesale value (*i.e.*, the amount purchased from LLR) and LLR does not enforce any sales requirements, allowing Fashion Consultants to purchase additional merchandise even if they have not met the purported sales requirement.

11.     LLR has close to 100,000 Fashion Consultants, but the vast majority of LLR's Fashion Consultants lose money. According to LLR's 2016 Income Disclosure Statement, LLR paid 72.63% of its Fashion Consultants *$0* in bonuses in 2016.

12.     The median annual bonus payments made to eligible Fashion Consultants in 2016 was $525.94. These numbers do not account for the money the Fashion Consultants paid LLR in product purchases.

13.     On information and belief, the vast majority of LLR's Fashion Consultants pay LLR more money than LLR pays them.  At the time most Fashion Consultants leave the business they are stuck with thousands of dollars in unsold inventory.

14.     In most cases, the Fashion Consultants use some of their inventory they buy from LLR for personal use, sell it for deep discounts, or give it away for free as part of their recruiting efforts. But, as the majority of Fashion Consultants learn, selling the product to non-Fashion Consultants for a profit is not a real income-generating possibility.

15.     The only people who make money from the LLR pyramid scheme are the very few at the top of the pyramid. These few, including Mark and Deanne Stidham, have gotten rich from defrauding the majority of Fashion Consultants who lose money. The Defendants promote the pyramid scheme by misrepresenting the financial rewards available to Fashion Consultants and falsely argue that LLR is a legitimate, legal enterprise.

16.     Perhaps most damning is the fact that Defendants do not prey on those who seek a get-rich-quick or idle investment scheme. Rather, they market the scheme to good people willing to work hard to make better lives for themselves

and their families. They prey on people in tight financial circumstances looking for some extra income. They tell their victims that, with enough hard work, they can help themselves financially by growing their LLR business. They tell unsuccessful Fashion Consultants (and the overwhelming majority are unsuccessful) that their lack of success is due to not buying enough product, and not working hard enough at growing their LLR business (*i.e.,* recruiting more Fashion Consultants).

17.    On their own behalf and on behalf of a class of similarly injured Fashion Consultants, Plaintiffs seek to hold Defendants financially liable for the operation and promotion of a pyramid scheme.

## II.    JURISDICTION AND VENUE

18.    The Defendants are subject to the jurisdiction of this Court. The Defendants at all relevant times have been engaged in continuous and systematic business in this State, have designated agents for service of process in this State, and/or have committed tortious acts in this State. The actions giving rise to this lawsuit were taken by defendants at least in part in California.  Plaintiff Bianchi is a citizen of California.

19.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(d).

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) and (b) because a substantial number of the acts and transactions that gave rise to the claims of the Plaintiffs and the proposed Class occurred within this District; Defendants did, or solicited, business, and transmitted communications by mail or wire relating to their illegal pyramid in this district; transacted their affairs, and/or resided within California and this judicial district; Plaintiff Brittany Bianchi is a resident of California, and Defendants' wrongful acts occurred in this District and have directly impacted the general public of this district; and the ends of justice require that parties residing in other districts be brought before this Court.

### III.   PARTIES

21.    Plaintiff Lora Haskett ("Ms. Haskett") is a Florida resident. Ms. Haskett entered into an Independent Consultant Agreement with LLR and became a LLR Fashion Consultant on or about May 2016.  Plaintiff was recruited into the pyramid scheme by Defendants and lost thousands of dollars as a direct result.

22.    Plaintiff Ashley Healy ("Ms. Healy") is a Florida resident. Ms. Healy entered into an Independent Consultant Agreement with LLR and became a LLR Fashion Consultant on or about January 2016.  Plaintiff was recruited into the pyramid scheme by Defendants and lost thousands of dollars as a direct result.

23.    Plaintiff Brittany Bianchi ("Ms. Bianchi") is a California resident. Ms. Bianchi entered into an Independent Consultant Agreement with LLR and became a LLR Fashion Consultant on or about July 2016.  Plaintiff was recruited into the pyramid scheme by Defendants and lost thousands of dollars as a direct result.

24.    Plaintiff Jocelyn Burke-Craig ("Burke-Craig") is a Florida resident. Ms. Burke-Craig entered into an Independent Consultant Agreement with LLR and became a LLR Fashion Consultant on or about November, 2015.  Plaintiff was recruited into the pyramid scheme by Defendants and lost thousands of dollars as a direct result.

25.    Plaintiff Kerry Tighe-Schwegler ("Ms. Tighe-Schwegler") is a New York resident.   Ms. Tighe-Schwegler entered into an Independent Consultant Agreement with LLR and became a LLR Fashion Consultant on or about July, 2016.  Plaintiff was recruited into the pyramid scheme by Defendants and lost thousands of dollars as a direct result.

26.    Defendant LuLaRoe, LLC d/b/a/ LuLaRoe is, a California Limited Liability Company located at 1375 Sampson Avenue in Corona, California, and doing business regularly throughout the United States, including in the state of California.

27.     Defendant LLR, Inc. is and at all material times was a Wyoming Corporation with its principal place of business located at 416 Double Eagle Ranch Road, Thayne, Wyoming 83127.

28.     LLR has sufficient and continuous contact with the Central District of California in that, among other things, maintaining their warehouse in this district, the Defendants have been actively promoting the pyramid scheme through the use of mails and wires in the district, selling products in the district, promoting their business in the district, and promoting their lines of sponsorship in the district.

## IV.    FACTUAL ALLEGATIONS

## A.   PARAMETERS OF A PYRAMID SCHEME

29.     While pyramid schemes can take different forms, they are at their core inherently illegal schemes by which their perpetrators recruit others to join the scheme with the promise of high profits and rewards from a putative business. Pyramid schemes, like LLR, may make money for those at the top of the chain or pyramid, but end up disappointing those at the bottom who can find no recruits.

30.     The essential characteristic of a pyramid scheme is the compensation of participants primarily derived from participants' payments into the scheme and based on participants' recruitment of new participants into the scheme. Little outside money comes into the scheme. The participants, knowingly or not, just feed off each other's money and are highly incentivized to bring new participants into the scheme. LLR's business model fits this description perfectly.

31.     Pyramid schemes are illegal in California as in most states. California Penal Code § 327 defines an endless chain (or pyramid scheme) as follows:

> any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing . . . additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant

introduces a new participant. Compensation . . . does not . . . include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.

**B.    LLR IS A PYRAMID SCHEME**

32.    LLR perfectly fits the pyramid scheme paradigm by requiring the Fashion Consultants to purchase product from LLR in return for which they receive (1) the right to sell a product *and* (2) the right to receive, in return for recruiting other participants into the program, bonuses which Fashion Consultants can only receive if they have met their minimum monthly purchase requirement from LLR.

**1.    Defendants Recruit Plaintiffs into Pyramid Scheme**.

33.    Defendants claim that LLR is a "simple business" in which Fashion Consultants can "earn full-time income for part-time work." Defendants claim that "[w]ith LulaRoe, in a matter of a few months, you can completely repay your initial investment and have money in the bank."

34.    LLR's program requires Fashion Consultants to pay LLR anywhere between $5,000-$8,000 for a Start Up Kit which includes initial inventory.  LLR refers to this process is "onboarding."

35.    Since LLR realizes that most of the Fashion Consultants are stay at home mothers with limited financial resources, Defendants encourage Fashion Consultants  to go into debt (*e.g*, credit cards, loans, home refinance) in order to finance their LLR inventory purchases.  LLR representatives have even suggested that mothers should sell their breast milk if they cannot afford their inventory purchase requirements.

36.    Defendants informed Fashion Consultants, including Plaintiffs, that they can recoup their initial investment and be profitable quickly.  For example, in

a LLR document that Defendants provide to Fashion Consultants titled "How Long To Pay Back My Initial Investment?", LLR claims that Fashion Consultants can do so in as little as 1-4 months:

| Repay yourself in | 4 months | 2 months | 1 month |
|---|---|---|---|
| Number of pieces sold each week | 20 | 40 | 75 |
| Gross Sales (per month) | $2,640* | $5,280* | $9,900* |
| Net Profit (per month) | $1,440* | $2,880* | $5,400* |

\* This is an approximate amount assuming you are selling in the middle of the low and high suggested retail.
\*\* Other startup expenses may include - Business Cards, Brochures, Hangers, Clothing Racks

37.    The document emphasizes that these figures are *conservative*:

A few things to consider:
- The chart above does not include the sale of the Lindsay Kimonos. Selling all of the Lindsay Kimonos would be an additional profit of $1,200.
- The average number of pieces sold at a pop-up boutique is 25. By doing one in-person or online pop-up per week (5-6 hours total per week) you can pay yourself back in 4 months. By doing 3 pop-ups per week (or 1-2 large online events) you can pay yourself back in approx 1 month.
- How many businesses can you invest in where you can pay off your initial investment within a matter of months and be profitable?
- $1,440/month is $17,280 per year, $2,880/month is 34,560, and $5,400/month is $64,800 per year!
- The above scenario is considering you are doing your business part-time (but working it as a business).
- You can also build a team and increase your income.

38.    These sales and profit margin numbers are reiterated in another document that LLR provides to Fashion Consultants titled "LuLaRoe Fashion Consultant Business Overview": "Based on the number of attendees at a Pop-Up Boutique we see an average sales volume of around 20 items, with an average profit of $15 per item.  The more parties you have and the more products you sell, the more money you will earn."

39.    Defendants sales, income and profit representations are misleading and without basis.  In reality, Fashion Consultants cannot sell the majority of the merchandise they receive from LLR (for reasons described in more detail below) and they wind up taking significant losses.

40.     Defendants also sell Fashion Consultants on the idea that they can "build a team" of other Fashion Consultants to earn significant bonuses. Defendants provide testimonials from leaders who have done so and take photos of them displaying bonus checks with large sums.

41.     LLR's bonus system requires Fashion Consultants to pay LLR more money through the purchase of additional inventory to remain "active" in the program and be eligible to receive bonuses.  For uplines to be eligible for bonuses, all of their downlines must be active.   Accordingly, Fashion Consultants are subject to pressure from their uplines to make monthly minimum purchases.  The downline Fashion Consultants are also pressured to recruit others and "build a team" to purchase from LLR so that they too can be eligible for bonuses from LLR and so their uplines can earn even greater bonuses.  This is how LLR entices its pyramid scheme participants to pay money into the scheme.

42.     Thus, the only meaningful source of funding for LLR and the Fashion Consultants is other Fashion Consultants' money.

43.     Thus, just like any classic pyramid scheme, the LLR scheme requires participants to put money into the scheme and rewards participants who bring in new participants.

44.     And just like any pyramid scheme, LLR pays Fashion Consultants with other Fashion Consultants' money. This is undeniably true because LLR sells its products only to Fashion Consultants and not directly to the public. During the class period, the overwhelming majority of the money flowing into LLR came from the Fashion Consultants, so the overwhelming majority of the money LLR used to pay Fashion Consultants came from the Fashion Consultants.

45.     The fact is that the large majority of Fashion Consultants lose money from their participation in LLR's pyramid scheme, while a few Fashion Consultants at the top of the pyramid and LLR grow rich.

46.     As a result, over 30,000 Fashion Consultants have voiced complaints on a LuLaRoe defective support group on Facebook.  This represents nearly a third of all Fashion Consultants.

## 2.     Payment Processing and Merchandise Returns Encourage Inventory Loading and Make it Difficult to Get Cash out of the Pyramid Scheme

47.     LLR's payment processing system and return policy for defective merchandise restricts a Fashion Consultant's ability to profitably sell their merchandise to end users and encourages inventory loading.

48.     Fashion Consultants are required to use a credit payment processing system approved by LLR.  A remarkable feature of LLR's program is that any sales a Fashion Consultant makes and processes through the payment system does not initially go to the Fashion Consultant.  Rather, it goes directly to LLR.  LLR will then deposit those funds, minus any fees LLR may deduct, into a debit card issued to the Fashion Consultant.

49.     If the Fashion Consultant wants to access her funds, check her balance, etc. on the debit card, she is charged a fee.  The only time the fees are waived is when the Fashion Consultant uses those funds to purchase additional inventory from LLR.

50.     Other than their initial inventory purchases, Fashion Consultants can only purchase inventory from LLR using their debit card or by using cash.

51.     If LLR agrees to accept the defective merchandise back from the Fashion Consultant, which is not always the case, the Fashion Consultant must pay for shipping and LLR will only provide a credit to the Fashion Consultant for the wholesale price of the item.  That credit can only be used by the Fashion Consultant for future inventory purchases from LLR.  Many Fashion Consultant's complain that they have waited months and still not receive credit for returned

merchandise. Non-Defective merchandise may be returned for credit less a 15-25% restocking fee.

### 3.    LLR's Compensation Plan Encourages Inventory Loading and Recruiting

52.    To become an LLR Fashion Consultant, a person must purchase a Start Up Kit and sign a LuLaRoe Independent Consultant Program Application and Agreement. Defendants do not provide Fashion Consultants with their Policies and Procedures until after they sign the Consultant Program Application and Agreement. During the time relevant to the Complaint, the Start Up Kit cost approximately $5,000-8,000. A person cannot become a Fashion Consultant without purchasing a Start Up Kit.

53.    Fashion Consultants can only select the size and style of the inventory they purchase, but not the style pattern. This is significant because many of LLR's fashion patterns can fairly be described as brightly colored and uniquely bold, or even ugly and unsellable. Consequently, such patterns would not appeal to a wide audience, limiting the Fashion Consultants ability to sell these items to an end-user.  Consequently, the Fashion Consultants feel compelled to order additional inventory in hopes of receiving a few items among those received that would have more universal appeal.  This creates a snowball effect where Fashion Consultants feel compelled to buy more inventory hoping a few of the items they receive will sell, while stockpiling most of the unusable items.

54.    In addition, the structure of LLR's Compensation Plan encourages inventory loading by requiring Fashion Consultants to purchase more product from LLR than they can profitably sell at retail each month so that the Fashion Consultants will remain "active" in the program and thereby eligible for LLR bonuses.  LLR encourages Fashion Consultants to order more product 2-3 times

per week in order to have "fresh inventory."   LLR has a minimum purchase requirement of 33 pieces.  LLR explains that "you gotta buy more to sell more."

55.   A basic concept in LLR is the "downline": the branching stream of junior Fashion Consultants whose entry into LLR ultimately links back to a particular Fashion Consultant (referred to as the junior Fashion Consultant's "upline").  A Fashion Consultant can earn 5% of the dollar amount of orders of a personally "sponsored" Fashion Consultant that she recruited.   As Defendants explain in the Leadership Bonus Plan it provides to Fashion Consultants:

> Sponsor – Any Fashion Consultant may sponsor other people into the business, however, in order to receive  a bonus on the Dollar Value of the Personal Volume of those you sponsored, you must Order 175 pieces in the calendar month for which the bonus is calculated.
>
> ***
>
> Sponsor – You will be eligible to earn a 5% override bonus on the Dollar Amount of the Orders of your new Personally Sponsored Fashion Consultant.   Orders and bonuses will be calculated per calendar month.

56.   One of the key distinctions in the LLR Bonus Plan is between Fashion Consultants and the higher leadership levels called "Mentors," "Trainers," and "Coaches." Most of the income-generating opportunities supposedly offered by LLR are available only to Fashion Consultants at these higher leadership levels. Fashion Consultants can graduate to higher leadership levels in LLR once they recruit a certain number of Fashion Consultants to their downline and generate a certain level of product purchases from LLR (personally and through the Fashion Consultants downline). Fashion Consultants will lose their Leadership status if they fail to maintain these levels. All Mentors, Trainers, and Coaches are Fashion Consultants, but not all Fashion Consultants are Mentors, Trainers, or Coaches.

57.   Leadership Bonuses available to a Fashion Consultant depends upon her ranking within the LLR leadership structure, and a Fashion Consultant's ranking is tied to the number of individuals in her downline and amount of product purchases attributable to a Fashion Consultant and her downline over particular time periods. In general, the more a Fashion Consultant purchases and recruits, and the more a Fashion Consultant's downline purchases and recruits, the more money LLR pays the Fashion Consultant.

58.   For example, to become a "Trainer" – the lowest level in the leadership group – A Fashion consultant must personally order 250 pieces each month from LLR, have at least three personally sponsored Fashion Consultants under her and a minimum of 10 Fashion Consultants on her team.  The team must purchase at least 1750 pieces from LLR in the aggregate (not including the 250 pieces the Fashion Consultant Trainer is required to purchase herself). If those requirements are met, the Trainer will earn 5% bonus on the dollar amount that personally sponsored Fashion Consultants order from LLR and  3% bonus on the dollar amount other Fashion Consultants in their downline purchase.



59.     The following graphic from LLR's Leadership Bonus Plan illustrates how this concept works when calculating a Trainer's compensation:

60.      Each succeeding level requires the Fashion Consultant to accumulate more Fashion Consultants downline from her, all or whom must purchase minimum amounts from LLR.  For example, to get to the next level after Trainer – "Coach" – the Fashion Consultant must still meet the individual purchase requirements of a Trainer (*i.e.* must still purchase a minimum number of pieces from LLR) and have at least three Fashion Consultants that reached Trainer status in her direct downline. The Trainers in her direct downline must purchase 1,750 pieces in the aggregate (not including the pieces the Coach is required to purchase herself). A Coach meeting these requirements can receive additional compensation from LLR based on the purchases the line makes from LLR.

### 4.     Fashion Consultants Make Few Retail Sales

61.     It is theoretically possible that Fashion Consultants could sell the product they purchased at retail for a profit. But only in rare circumstances are LLR Fashion Consultants able to profitably sell the products they purchase from LLR.

62.     In fact, LLR has little interest in retail sales. The compensation it pays to Fashion Consultants is contingent on the Fashion Consultants' purchases. LLR has little interest in retail sales because its true customers are the Fashion Consultants—the people willing to pay the price LLR charges for its products so that they can access LLR's bonus plan.

63.     Plaintiffs were unable to profitably sell the LLR products they purchased. Their experiences are consistent with the majority of other Fashion Consultants. A CBS Market Watch article published on March 15, 2017  indicates that profitable retail sales are rare:

**Why LuLaRoe can be a tough sell for its many salespeople**

Multilevel marketer LuLaRoe, which is battling two federal lawsuits and complaints about the quality of its brightly colored leggings and other fashions, is proving to be a tough sell for the company's 77,491 independent consultants.

According to internal LuLaRoe data shared with CBS MoneyWatch by two sources, more than 70 percent, or 55,571 LuLaRoe representatives, sold less than $5,000 worth of retail goods in February. About 3,700, or less than 5 percent, reported more than $10,000 in sales. In addition, 6,579, or 8 percent of representatives, sold nothing and ordered nothing.

"What we find over and over and over is that a negligible amount of retail sales are actually happening," said Tracy Coenen, a forensic accountant and critic of the multilevel marketing (MLM) industry, who has raised questions about LuLaRoe's business practices. "You don't know if they profited," she said, "or if these people [at LuLaRoe] put all of their so-called profits back into buying more inventory, which is what is encouraged."

The sources' information doesn't indicate how many consultants are profitable, and a company spokesman declined to address the issue. Current and former LuLaRoe representatives have told CBS MoneyWatch it would be difficult to earn a return on $5,000 in sales and that $10,000 in revenue isn't necessarily a sure-fire profit either, given operating expenses, inventory and taxes. They declined to be identified by name out of fear of reprisals by the company.

One area where LuLaRoe has excelled is recruiting new consultants. As of July 2016, the company had about 26,000 consultants, indicating their ranks have nearly tripled in less than a year. That development is proving to be problematic for some consultants, who say they're losing sales to their new rivals.

One consultant told CBS MoneyWatch her weekly sales have fallen from between 35 to 40 items to about 5 to 10 items. Such cannibalization is common at MLMs.

"Unlike traditional franchising or even traditional single-level direct selling, the MLM model is an all-against-all competition," said William Keep, dean of the College of New Jersey's College of Business, in an

email. "That will likely result in either a decrease in the selling price to nondistributor customers (and, therefore lower margin for the distributor), or efforts by the company to limit competition (e.g., limit sales on eBay, use only company websites, etc.), or both."

64.   LLR contractually prohibits Fashion Consultants from selling the products through the most critical distribution channels where Fashion Consultants could reasonably expect to sell enough product to make a meaningful profit. For example, LLR prohibits Fashion Consultants from selling or advertising the sale of LLR apparel "on any online retail store or ecommerce site or platform (including an e-commerce site created or operated by an Independent Fashion Consultant) such as Amazon, AliBaba, eBay Stores, etc. Nor may an Independent Fashion Consultant enlist or knowingly allow a third party to sell LLR products on any online retail store or ecommerce site."  Further, Fashion Consultants are prohibited from creating independent public websites to sell their LLR merchandise. These prohibitions bar Fashion Consultants from accessing the most obvious and effective means of selling LLR products to the general public.

65.   In addition, LLR forbids its Fashion Consultants from selling LLR products at brick-and-mortar establishments and generally prohibits any radio or television advertising. LLR seeks to limit the Fashion Consultants to one-on-one situations in private locations (such as the Fashion Consultant's or a friend's home), but achieving significant, profitable retail sales by this method is extremely difficult.

## 5.   LLR has little interest in retail sales

66.   LLR's prohibition on Fashion Consultant sales through e-commerce platforms confirms that LLR has little interest in retail sales. Dozens of producers of women's apparel sell their products on e-commerce platforms. If LLR really wanted its Fashion Consultants to sell to retail customers, it would allow them to sell through e-commerce sites.

67.     LLR further demonstrates its disregard for retail sales by failing to limit the number of Fashion Consultants it onboards in any given territory (commonly referred to as "territory recognition").   Consequently, a Fashion Consultant may be competing with a dozen other Fashion Consultants in her neighborhood who are selling similar LLR merchandise.  In fact, a number of current and former Fashion Consultants have complained about oversaturation.

68.     LLR's  failure to account for territory recognition when onboarding new Fashion Consultants impacts a Fashion Consultant's ability to sell merchandise.

69.     LLR has limited interest in whether its Fashion Consultants sell its products to retail purchasers because LLR's true customers are its Fashion Consultants. LLR is able to sell its women's apparel to its Fashion Consultants because LLR is selling them something more than products: it sells them the dream of making money by participating in LLR's bonus plan.

70.     LLR restricts the ways in which its Fashion Consultants can sell its products so that the Fashion Consultants must meet face-to-face with potential customers where they, too, can sell the "business opportunity," as well as the product.

### 6.     LLR Operates a Pyramid Scheme Despite its Smokescreen Policies

71.     Up until July 2017, LLR explicitly required its Fashion Consultants to (1) purchase a minimum amount from LLR and (2) have downline Fashion Consultants in order to receive a bonus in the calendar month for which the bonus is calculated.

72.     Recognizing that its business bears all the traits of a pyramid scheme, LLR has just recently adopted policies in an effort to avoid the pyramid scheme label without changing its business practices.   For example, LLR's agreement

claimed that "LLR does not pay any compensation, bonus, or commission for enrolling consultants or others." Of course, as alleged herein, this statement is false, as, the *only* way to receive bonuses is to recruit new Fashion Consultants to purchase inventory from LLR.

73.   **The "70%" Rule:** The Federal Trade Commission, in a well-known decision, *In the Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979), determined that an Mulitevel Level Marketing operation ("MLM") might avoid the pyramid scheme label if the MLM required Distributors to actually sell to retail customers or consume 70% of the products they purchased each month.  Up until July 2017, LLR did not even pay lip-service to this rule. While LLR purported to implement a sales requirement in July 2017, LLR does not actually require Fashion Consultants to make the  retail sales described in the rule and will continue to accept purchase orders from Fashion Consultants even if they have not satisfied the purported sales rules.

74.   For example, LLR has reduced the minimum sales requirement to 1 piece per month because so many consultants were quitting and "giveaways" count toward piece counts for sales quotas.  Defendants do not comply with the 70% Rule.

75.   **The "Buyback" Rule**: In the *Amway* decision, the FTC described the buyback rule as follows: "Amway, the Direct Distributor or the sponsoring distributor will buy back any unused marketable products from a distributor whose inventory is not moving or who wishes to leave the business.  *Amway*, 93 F.T.C. 618 at 72- 75. Defendants do not comply with this rule. They will not provide a 100% refund, require the Fashion Consultant to pay for shipping back to LLR, may determine at its sole discretion that the Fashion Consultant is not entitled to a refund,  often does not provide any refund and will impose a 25% charge for returns.   Further, instead of sending back any product that Defendants do not

accept for a refund, they claim to send it to charity. Even if a refund is issued, LLR takes several months to issue a refund, if any.  LLR's smokescreen refund policy is woefully inadequate to prevent the conclusion that LLR is a pyramid scheme.

76.  **The Ten Customer Rule**: The "ten customer rule" approved by the FTC in *Amway* provided that "distributors may not receive a performance bonus unless they prove a sale to each of ten different retail customers during each month." *Amway*, 93 F.T.C. 618 at 72-75. The FTC added: "[p]yramid sales plans based on inventory loading or headhunting fees create an incentive for recruiting rather than selling products to consumers . . . Amway's ten-customer rule deters inventory loading by sponsoring distributors." *Id*. at 142-147. For the past four years, LLR had no such rule.  Although in July 2017, LLR claims to have implemented a minimal sales requirement in order for a Fashion Consultant to qualify for bonuses, notably, Fashion Consultants must still meet their minimum LLR purchase requirement to remain active and thus be eligible for bonuses. Moreover, Defendants do not enforce the supposed requirement and  will still  sell inventory to Fashion Consultants who do not meet the purported sales requirement. Thus, LLR's smokescreen retail sales policy does not prevent or deter inventory loading.

77.  Defendants are aware of, approves, promotes, and facilitates the systematic noncompliance with or breach of, the rules that purportedly protect against the operation of a pyramid scheme, as discussed in the *Amway* FTC Order.

78.  As discussed above, the essential reasons why LLR is a pyramid scheme are that it (a) requires and incentivizes Fashion Consultants to pay money to LLR to participate in the bonus plan, (b) rewards recruiting and inventory loading over retail sales, and (c) primarily compensates Fashion Consultants with other Fashion Consultants' money.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

79.    Plaintiff Brittany Bianchi was persuaded to become a Fashion Consultant from another Fashion Consultant.

80.    Ms. Bianchi signed up to become a LLR Fashion Consultant on or around July 19, 2016 and subsequently invested approximately $8,000 purchasing LuLaRoe inventory. She additionally invested $2,000.00 in supplies, including but not limited to hangers, portable clothing racks, shipping supplies, shipping program, scales, etc.

81.    Ms. Bianchi funded her initial investment through an existing credit card and a home savings account.

82.    Ms. Bianchi was instructed by Defendants and its representatives to consistently purchase new inventory and was pressured by Defendants and its representatives to   use any money she obtained from selling the products to purchase more inventory. These Communications were made by LLR owners Deanne and Mark Stidham, on weekly live video calls and reiterated by LLR representatives.

83.    Because of the severe marketing restrictions that Defendants placed on Fashion Consultants, Ms. Bianchi faced great challenges selling Defendants' products. Additionally, the market had become saturated with current Fashion consultants who were trying to move the inventory they were perpetually purchasing and disillusioned Fashion Consultants who were trying to unload their unsold inventory at deep discounts.

84.    Based on Ms. Bianchi's experience with LLR, the main focus of the business is on recruitment of other Fashion Consultants and the Fashion Consultants buying inventory, rather than selling inventory to customers.

85.    Ms. Bianchi had no choice but to liquidate her inventory or she would continue to lose money purchasing inventory over which she had no control and

could not sell. She incurred a loss of about $6,000.00 in Defendants' products, despite her efforts.

86.   Plaintiff Lora Haskett has a special needs child so needed to work from home.

87.   Ms. Haskett signed up to become a LLR Fashion Consultant on or around May, 2016 and subsequently invested approximately $7,000.00 in LuLaRoe inventory.  She additionally spent approximately $500.00 in supplies, including but not limited to hangers, 1 portable clothing rack, storage bins, shipping supplies, shipping program, scales, etc.

88.   Ms. Haskett financed her initial $7,500.00 investment through her credit card.

89.   Ms. Haskett was instructed by Defendants and its representatives to consistently purchase new inventory and was pressured by Defendants and its representatives to  use any money she obtained from selling the products to purchase more inventory. These Communications were made by LLR owners Deanne and Mark Stidham, on weekly live video calls and reiterated by LLR representatives.

90.   Because of the severe marketing restrictions that Defendants placed on Fashion Consultants, Ms. Haskett faced great challenges selling Defendants' products. Additionally, the market had become saturated with current Fashion consultants who were trying to move the inventory they were perpetually purchasing.

91.   Based on Ms. Haskett's experience with LLR, the main focus of the business is on recruitment of other Fashion Consultants and inventory loading, rather than selling inventory to customers.

92.   Ms. Haskett had no choice but to liquidate her inventory or she would continue to lose money purchasing inventory over which she had no control and

could not sell. She lost thousands of dollars in Defendants' products, despite her efforts.

93.   Plaintiff Ashley Healy is a stay at home Mom, with a husband in law enforcement, so she wanted to work from home to supplement the family income.

94.   Ms. Healy signed up to become a LLR Fashion Consultant on or around January, 2016 and subsequently invested approximately $8,000 in LuLaRoe inventory. She additionally invested $1,500.00 in supplies, including but not limited to hangers, portable clothing racks, shipping supplies, scales, etc.

95.   Ms. Healy financed her initial $9,500.00 investment through several credit cards and borrowed money from family.

96.   Ms. Healy was instructed by Defendants and its representatives to consistently purchase new inventory and was pressured by Defendants and its representatives to  use any money she obtained from selling the products to purchase more inventory. These Communications were made by LLR owners Deanne and Mark Stidham, on weekly live video calls and reiterated by LLR representatives.

97.   Because of the severe marketing restrictions that Defendants placed on Fashion Consultants, Ms. Healy faced great challenges selling Defendants' products. Additionally, the market had become saturated with current Fashion Consultants who were trying to move the inventory they were perpetually purchasing requiring Ms. Healy to substantially discount her products and offering free services.  Moreover, Healy was eventually competing against disillusioned Fashion Consultants who were trying to unload their unsold inventory at deep discounts.

98.   Based on Ms. Healy's experience with LLR, the main focus of the business is on recruitment of other Fashion Consultants and inventory loading, rather than selling inventory to customers.

99.   Ms. Healy had no choice but to liquidate her inventory on or around April, 2017 or she would continue to lose money purchasing inventory over which she had no control and could not sell. She lost about $4,000.00 on Defendants' products, despite her efforts.

100.   Plaintiff Jocelyn Burke-Craig has a special needs child so needed to work from home.

101.   Plaintiff Burke-Craig signed up to become a LLR Fashion Consultant on or around November, 2015 and subsequently invested approximately $3,000 in LuLaRoe inventory. She additionally invested approximately $2,000 in supplies, including but not limited to hangers, portable clothing racks, shipping supplies, shipping program, scales, etc.

102.   She financed her initial $5,000.00 investment through her credit card.

103.   Plaintiff Burke-Craig was instructed by Defendants and its representatives to consistently purchase new inventory and was pressured by Defendants and its representatives to  use any money she obtained from selling the products to purchase more inventory.  These Communications were made by LLR owners Deanne and Mark Stidham, on weekly live video calls and reiterated by LLR representatives.

104.   Because of the severe marketing restrictions that Defendants placed on Fashion Consultants, Plaintiff Burke-Craig faced great challenges selling Defendants' products. Additionally, the market had become saturated with current Fashion consultants who were trying to move the inventory they were perpetually purchasing.

105.   Based on Burke-Craig's experience with LLR, the main focus of the business is on recruitment of other Fashion Consultants and inventory loading, rather than selling inventory to customers.

106.   Plaintiff Burke-Craig had no choice but to liquidate her inventory or she would continue to lose money purchasing inventory over which she had no control and could not sell. Based on her accountant,  she lost about $20,000.00 in Defendants' products, despite her efforts.

107.   Plaintiff Kerry Tighe-Schwegler was persuaded to become a Fashion Consultant from another Fashion Consultant.  She was persuaded to join, in part, because her family was experiencing financial difficulties and she needed to supplement the family income.

108.   Plaintiff Tighe-Schwegler signed up to become a LLR Fashion Consultant on or around July, 2016 and subsequently invested approximately $6,000 in LuLaRoe inventory. She additionally invested approximately $2,000 in supplies, including but not limited to hangers, portable clothing racks, shipping supplies, shipping program, scales, containers, a display mannequin, etc.

109.   She financed her initial $8,000.00 investment with a credit card obtained for the purpose of investing in the LLR business.

110.   Plaintiff Tighe-Schwegler was instructed by Defendants and its representatives to consistently purchase new inventory and was pressured by Defendants and its representatives to  use any money she obtained from selling the products to purchase more inventory.  These Communications were made by LLR owners Deanne and Mark Stidham, on weekly live video calls and reiterated by LLR representatives.

111.   Because of the severe marketing restrictions that Defendants placed on Fashion Consultants, Plaintiff Tighe-Schwegler faced great challenges selling Defendants' products. Additionally, the market had become saturated with current Fashion consultants who were trying to move the inventory they were perpetually purchasing.

112.   Based on Tighe-Schwegler's experience with LLR, the main focus of the business is on recruitment of other Fashion Consultants and inventory loading, rather than selling inventory to customers.

113.   Plaintiff Tighe-Schwegler had no choice but to liquidate her inventory or she would continue to lose money purchasing inventory over which she had no control and could not sell. Based on her 2016 tax return, she lost about $17,000.00 in Defendants' products, despite her efforts.

## CLASS ACTION ALLEGATIONS

114.   This action is brought by Plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23.

115.   Plaintiffs Lora Haskett, Ashley Healy, Jocelyn Burke-Craig, Kerry Tighe-Schwegler, and Brittany Bianchi seek relief on behalf of themselves and a nationwide class of all persons who were LLR Fashion Consultants from October 2013 until the present (the "class").  Excluded from the class are the defendants, their employees, family members, and affiliates any Fashion Consultant who obtained Trainer, Coach, or Mentor status.

116.   Plaintiffs Lora Haskett, Ashley Healy, Jocelyn Burke-Craig, Kerry Tighe-Schwegler, and Brittany Bianchi also seek disgorgement and other relief for themselves and a subclass pursuant to the California State law claims, which includes all persons who are members of the class and who were or are LLR distributors resident in California (the "subclass").

117.   Plaintiffs Lora Haskett, Ashley Healy, Jocelyn Burke-Craig, Kerry Tighe-Schwegler, and Brittany Bianchi further seek to pursue a private attorney general action for injunctive relief on behalf of the people of California, and they satisfy the applicable standing and class action requirements, as described herein.

118.   Plaintiffs Lora Haskett, Ashley Healy, Jocelyn Burke-Craig, Kerry Tighe-Schwegler, and Brittany Bianchi would consider rejoining LLR if it reforms its practices to comply with the law.

119.   The members of the class and the subclass number in the thousands and joinder of all Class members in a single action is impracticable.

120.   There are questions of law and/or fact common to the class and subclass, including but not limited to:

   a.   Whether LLR was operating an unlawful pyramid scheme;

   b.   Whether Fashion Consultants paid money to LLR in exchange for (1) the right to sell a product and (2) the right to receive, in return for recruiting others in to the program, rewards which historically were unrelated to the   sale of the product to retail consumers;

   c.   Whether Fashion Consultants were required to make an investment into  the pyramid scheme;

   d.   Whether Defendants enforced the 70% rule;

   e.   Whether Defendants enforced the buy-back rule;

   f.   Whether Defendants enforced the ten customer rule;

   g.   Whether Defendants' conduct constitutes an "Endless Chain" under the California Penal Code;

   h.   Whether Defendants omitted to inform plaintiffs and the plaintiff class that they were entering into an illegal pyramid scheme and that most  participants lose money;

   i.   Whether Defendants misrepresented or omitted facts about Fashion Consultant's ability to pay back their initial investment

   j.   Whether and to what extent the conduct has caused injury to Plaintiffs  and the plaintiff class;

k.    Whether Defendants' conduct constitutes an unlawful, unfair and fraudulent business practice under the California Business and Professions Code; and

l.    Whether Defendants' conduct constitutes false advertising under the California Business and Professions Code.

121.   These and other questions of law and/or fact are common to the class and the subclass, and predominate over any question affecting only individual class members.

122.   Plaintiffs' claims are typical of the claims of the class and the subclass in that Plaintiffs were distributors for LLR and lost money as a result of the pyramid scheme.

123.   Plaintiffs will fairly and adequately represent the interests of the class and the subclass in that plaintiffs' claims are typical of those of the class and plaintiffs' interests are fully aligned with those of the class.   Plaintiffs have retained counsel who is experienced and skilled in complex class action litigation.

124.   Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

125.   Plaintiffs know of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF**
**(Endless Chain Scheme: California Penal Code §327**
**and Section 1689.2 of the California Civil Code)**

126.   Plaintiffs re-allege the foregoing paragraphs as though fully set forth

herein.

127.   Section 1689.2 of the California Civil Code provides:

A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

128.   LLR is operating an endless chain scheme.

129.   Plaintiffs and the class have suffered an injury in fact and have lost money or property because of LLR's operation of an endless chain, business acts, omissions, and practices.

130.   Plaintiffs and the class are entitled to:

a.     rescind the contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme;

b.     restitution, compensatory and consequential damages (where not inconsistent with their request for rescission or restitution);  and

c.     attorneys' fees, costs, pre- and post-judgment interest.

**SECOND CLAIM FOR RELIEF**
**(Unlawful, Unfair and Fraudulent Business Practices Under the California Business and Professions Code § 17200, *et seq*.)**

131.   Plaintiffs re-allege the foregoing paragraphs as though fully set forth herein.

132.   Defendants are engaged in ongoing and continuous unlawful, unfair, and fraudulent business acts or practices, and unfair, deceptive, untrue and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq*. The acts practices alleged herein constitute a

pattern of behavior, pursued as wrongful business practice that has victimized and continues to victimize thousands of California consumers.

133.   Pursuant to California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law. Defendants' business practices are unlawful because they involve the creation and promotion of an illegal pyramid scheme or "endless chain" under California law.

134.   Defendants are engaged in an illegal pyramid scheme or "endless chain" as defined under California Penal Code § 327. Defendants utilize this illegal pyramid scheme with the intent, directly or indirectly to dispose of property, in the form of LLR products and to convince distributors to recruit others to do the same.

135.   Pursuant to California Business and Professions Code § 17200, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

136.   Defendants' promotion and operation of an illegal pyramid scheme is unethical, oppressive and unscrupulous in that defendants are duping California consumers out of millions of dollars through their illegal pyramid scheme.

137.   Pursuant to California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public. Defendants' business practice is fraudulent in that they have deceived the public by misrepresenting the nature of their business.  For example, Defendants have failed to inform the public that they are openly an illegal pyramid scheme. California citizens have relied, and continue to rely on defendants' misrepresentations and omissions to their detriment. Moreover, Defendants misrepresented facts about the amount of money that a Fashion Consultant would earn, including false statements about the average selling prices and number of pieces sold by Fashion Consultants

at Pop Up Boutiques and the amount of time in which Fashion Consultants could recoup their investment and become profitable.

138.   As a result of their unlawful, unfair and fraudulent acts, Defendants have reaped and continue to reap unfair benefits and illegal profits at the expenses of Plaintiffs and the class members.

139.   Defendants should be made to disgorge these ill-gotten gains and restore Plaintiffs and the class the wrongfully taken revenue.

140.   Defendants' unlawful, unfair and fraudulent acts and/or omissions will not be   completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203, Plaintiffs seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions related to operating the illegal pyramid scheme. Plaintiffs also seek restitution, disgorgement, and any other appropriate equitable relief.

## <u>THIRD CLAIM FOR RELIEF</u>
### (California Business and Professions Code § 17500, *et seq.*)

## <u>False Advertising</u>

141.   Plaintiffs and the subclass re-allege the foregoing paragraphs as though fully set forth herein.

142.   Defendants' business acts, false advertisements and materially misleading omissions alleged herein constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code § 17500, *et seq.*

143.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions that were likely to deceive the public and include, but are not limited to:

a.     Defendants' failing to disclose to Plaintiffs that they were entering into an unlawful pyramid scheme; and

b.     Defendants' misrepresenting facts about the amount of money that a Fashion  Consultant would earn, including false statements about the average selling prices  and number of pieces sold by Fashion Consultants at Pop Up Boutiques and the amount  of  time  in  which  Fashion Consultants could recoup their investment and    become profitable.

144.   Defendants' marketing and promotion of the illegal pyramid scheme constitutes misleading, unfair and fraudulent advertising in connection with their false advertising to induce consumers to join the illegal pyramid scheme. Defendants knew or should have known, in the exercise of reasonable care, that the statements they were making were untrue or misleading and did deceive members of the public. Defendants' knew or should have known, in the exercise of reasonable care, that California citizens, including Plaintiffs, would rely, and did in fact rely, on defendants' misrepresentations and omissions.

145.   Defendants should be ordered to disgorge, for the benefit of Plaintiffs and the plaintiff class, their LLR profits and compensation and/or make restitution to the Plaintiffs and the class.

146.   Under California Business and Professions Code section 17535, Plaintiffs and the Class Members seek a judicial order directing Defendants to cease and desist with all false advertising related to the Defendants' illegal pyramid scheme and any such other injunctive relief as the Court finds just and appropriate. Plaintiffs also seek restitution, disgorgement, and any other appropriate equitable relief.

**PRAYER FOR RELIEF**

The named plaintiffs and the plaintiff class request the following relief:

      a.     Certification of the class;

      b.     Judgment against Defendants;

      c.     Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

      d.     Damages for the financial losses incurred by Plaintiffs and by the class because of Defendants' conduct and for injury to their business and property;

      e.     Restitution and disgorgement of monies;

      f.     Temporary and permanent injunctive relief enjoining Defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, false advertising;

      g.     The cost of suit including reasonable attorneys' fees in accordance with California Code of Civil Procedure section 1021.5, and otherwise provided by law;

      h.     For damages in an amount yet to be ascertained as allowed by law; and

      i.     For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  October 27, 2017        **GLANCY PRONGAY & MURRAY LLP**


By:  *s/ Marc L. Godino*
Marc L. Godino
Mark S. Greenstone
Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
E-mail: info@glancylaw.com

**TAUS, CEBULASH & LANDAU, LLP**
Kevin Landau
Brett Cebulash
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
klandau@tcllaw.com
bcebulash@tcllaw.com
mgreaves@tcllaw.com

*Attorneys for Plaintiffs*